NEW YORK OYER AND TERMINER. April, 1855. *Edward P. Cowles,* Justice of the Supreme Court, presiding.

### THE PEOPLE *vs.* TERRENCE HAMMILL.

On the trial of the prisoner for the murder of his wife, it having been proved that he killed her by stamping upon her, the court charged the jury that the crime was murder, if the prisoner intended to take the life of his wife; but that if he intended only to wound and bruise her, it was manslaughter in the second degree.

The court further charged, that, if the prisoner designed to take the life of the deceased, it made no difference as to the offence, whether he was drunk or sober at the time.

That though intoxication does not excuse crime, yet that the jury might take into consideration the fact of intoxication, so far as it would aid them in determining with what intent the act was done.

It is a rule of the common law, that a person is held to intend that which in the ordinary course of things would be the natural result of his own acts.

Illustrations of this rule given by the presiding judge, in his charge to the jury, with explanations as to its applicability in a case of intoxication.

In cases not free from doubt, the jury are at liberty to consider the prisoner's previous good character; but such a defence is not available where the guilt of the accused is clearly established.

The prisoner was brought to trial under an indictment charging the murder of his wife on the first day of January, 1855. He

The People *v.* Hammill.

was a laboring man of an unusually powerful frame and of great physical strength.

On the evening of January 1st, 1855, he was discovered in his house in the act of stamping upon his wife, who, on being raised from the floor, was found to be dying, and survived for a few moments only. No one before this discovery had witnessed the scene. His wife's person exhibited marks of the most brutal violence, the head and chest being covered with bruises and blood. She had evidently been stamped to death by the prisoner, who wore heavy iron-nailed shoes. No cause was shown for the prisoner's acts, further than that both the prisoner and his wife had returned some two hours before from a visit to one of their neighbors, in a state of partial intoxication. A bottle of liquor, known to have been partially filled on their return, was found in the house empty.

For the defence the prisoner was proved to have been a man of previous excellent character, unusually industrious and frugal. Except when under the influence of liquor, he was shown to have been habitually and uniformly kind, attentive and affectionate to all of his family; that his habits were, with few exceptions, strictly temperate. Occasionally (and generally only on anniversaries or holidays) he would give way to intoxication. When under the influence of spirituous liquors, he generally became infuriated and ungovernable, attacking any one who came in his way, not distinguishing, and apparently incapable of distinguishing, between friends and strangers. That, except on such occasions, he was mild, peaceable, quiet and inoffensive in his manners.

The prosecution claimed a verdict for murder. The defence urged that it should be only for manslaughter in the second degree.

*A. Oakey Hall,* (District Attorney) for the people.

*H. L. Clinton,* for the prisoner

The court charged the jury as follows:

*Gentlemen.*—The case now to be committed to your hands is an unusually painful one. The prisoner is not a man who has been familiar with vice or hardened by crime. Though in the humble walks of life he is proved by men of the highest standing who have known him well, to have sustained the most irreproachable character for honesty, integrity and industry, and on all occasions, except when infuriated by intoxication, for kindness, and attention, and affection to all his family. With that single exception, no better character in all these respects, or for quietness and unobtrusiveness of manners, could have been shown than has been established for him.

But he stands before you now charged with the murder of his wife. So clear is the proof that she died by violence and that violence inflicted by the prisoner, that his counsel does not insist to the contrary, but urges that the crime is less in degree than that of murder.

This is a question for you. Your duties are first to determine whether the deceased came to her death by violence. If so, then next whether it was inflicted by the prisoner. If you find in the affirmative on both of these questions, your next inquiry will be whether these acts of violence were, in the language of the statute, " perpetrated from a premeditated design to effect the death of the person killed." If so, then the prisoner is guilty of the crime of murder.

The important question for you to determine, if you find that the prisoner caused this death, will be the *intent* with which he did this violence. What did he intend? What did he design should be the result of his acts? Did he mean to kill? Was that idea in his mind as he gave the blows! If so, the crime is complete and your verdict must pronounce it murder.

And it matters not what was his state as respects sobriety or intoxication at the time, provided you find he gave the blows with the design to kill; for, if he meant that, then, whether at the time he was drunk or sober, in either case, his crime is murder.

Whether he was intoxicated or otherwise, the question will still be, What was his intent? Was it to kill or only to wound

and bruise?   On the solution of that question rests your verdict, for intoxication is no excuse for crime.   For an act designedly perpetrated although done when drunk, the law holds the perpetrator to the same responsibility as if done when sober.

But while intoxication does not excuse crime, in other words does not excuse a party from the consequences of acts which he purposely perpetrates, although drunk at the time, nevertheless the jury may always take into consideration the fact of the intoxication of the accused just so far as it will aid them in determining with what intent the act was done.   We do not always attribute the same motives or intentions to the acts of a drunken, that we do to those of a sober man.   We act upon this rule in every day life, and we act upon it because our experience teaches its correctness.

A familiar example from such scenes as you have probably all of you witnessed will illustrate my meaning.

A person in a state of intoxication approaches us in a rude and boisterous or in an unduly familiar manner.   Do we not often feel and indeed know that in all this there is an entire absence of the remotest idea of insulting or offending, that such conduct results from an impaired judgment or power of discrimination or sense of propriety caused by the state of inebriety in which we see him.   Yet the same acts perpetrated by the same person in a state of sobriety would lead us to no other inference than that insult and outrage were intended.   Intoxication partially impairs the judgment, as is exemplified when we see a man in his cups sometimes give blows which in their effects are far more severe than he intends or is conscious of.   It arises from his inability to measure the strength he is putting forth with the same accuracy he does when sober. All these things in every day life we consider when determining how far a party has intended the full effect produced by his acts.

In so far then as the fact of this man's intoxication may aid you in solving the question whether, when he gave his wife these blows, he only intended to hurt, to bruise, or meant that

The People *v.* Hammill.

they should kill, you are at liberty to consider it, but not otherwise. In looking in upon his mind, in analyzing its secret workings, motives and intent, during that fatal hour, this fact may throw some light upon what he meant should be the consequences of his brutality and violence. So far and with that view, you may consider it; but no further.

It is an old and salutary general rule of the common law that a man is held to intend that which in the ordinary course of things would be the natural results of his acts.

This rule is based upon sound reason and universal experience. Thus, if one raises his rifle and deliberately fires its contents into the bosom of another, or by a blow with an axe which might fell an ox buries it in the brain of another, the inference from the act is irresistible that death was meant, and so the law presumes.

The inferences of the mind which are equally presumptions of law are certain and conclusive in proportion as the acts from their nature and character are certain to result in death.

Thus the plunging of a poniard into the heart of another we do not doubt was meant to kill, but if aimed only at the arm or leg, though death may be the result, yet the mere fact of giving such a blow so long as that is the only criterion by which we judge, renders the intent more doubtful and the inference less strong.

So if one beat a full grown man with his fist and death ensues we would ordinarily feel far more doubt that death was intended, than if it had been produced by the use of a dangerous weapon.

So too regard may be had to the relative strength and powers of endurance of the parties as well as to the mode in which the violence is applied.

A powerful blow given by the fist alone (but not repeated) upon the head of a full grown man would not ordinarily be regarded as intended to produce death; but what else could be inferred than an intent to kill, if the same blow were planted upon the temple of an infant child.

In many cases the inference that death is intended is as

strong when the act is perpetrated by a drunken as when perpetrated by a sober man.

Thus, if by a deadly weapon, as by a rifle or bowie knife, a bullet or blow is sent directly or designedly to some vital spot, we should infer that death was intended with almost equal certainty whether the perpetrator were drunk or sober.

So too when death is produced by poison, and we see in the mode of its administration stealthy calculation, we would infer that death was intended, whether he who administered the poison was in a state of sobriety or intoxication, since, in the very character of the act, we could read design.

But we also know that intoxication produces more effect upon the nervous system of some than of others. It clouds and obscures the judgment of one more than it does another. It produces greater extravagance of exertion and action in some than it does in others, and sometimes consequences result, from such extravagant exertion and action, of which the party himself had no idea. All these things are to be considered by this jury when determining upon this question of intent.

Had this prisoner, in a state of entire sobriety, thus deliberately kicked and stamped upon his wife, and for that length of time which the mutilations of her person showed must have been the case, this jury might not have hesitated in believing that such brutality so long continued was the prompting of a murderous mind.

If however you find that he was in a state of intoxication which was affecting his whole nervous organization; that in consequence his judgment was impaired and to such an extent that he was in a measure incapable of knowing the degree of violence he was perpetrating or of properly and accurately calculating its effects to their full extent, all this the jury may take into consideration so far as it enables them to judge whether, at the time of the violence, he meant only to beat or to kill.

If he perfectly understood what he was doing and either designed her death, or if he well knew that such was likely to be the consequence of his acts and yet kept on neither consid-

The People *v.* Hammill.

ering nor caring what the result of his violence might be, his crime is that of murder.

But if his judgment was in part obscured and his only intention was to severely beat his wife but with no thoughts that death was either certain or possible, then the jury may convict of a less offence. His crime would then be of that species which the statute defines as the "killing of a human being without a design to effect death, in a heat of passion, but in a cruel and unusual manner."

The prisoner has proved an excellent previous character. In many cases this is of great importance, in others none whatever.

Where the intent to kill is clearly proved, if that is the only question, then character avails nothing in defence. Wanton killing is as much murder in the virtuous as in the vicious. But when the intent is not certain, when the minds of the jury feel that the scales are nearly poised, then the jury may do that which the prisoner humbly asks them to do here, throw the weight of his good character into the scales and thus secure a preponderance in his favor. In cases not free from doubt, the law allows it. The prisoner may, if you are not entirely satisfied by the testimony, point to his past life and urging the fact with all the force to which it is entitled say I have been a man of peace and quiet, not of turbulence and blood; I have been uniformly honest, faithful and industrious, kind and affectionate in my family, attentive to all their wants and reputable and respectable in society. He asks you to remember all this and then to say whether he has from "premeditated design" killed the wife of his youth and the mother of his children. If he has, it is murder and on your oaths you must so pronounce it. If you find otherwise but are still satisfied that she has died by his violence, you may find a verdict of manslaughter in the second degree.

The jury found a verdict of manslaughter in the second degree.